IN THE MATTER OF GEORGE W. KENNEDY.

Suffolk. June 10, 1998. - August 6, 1998.

Present: WILKINS, C.J., LYNCH, GREANEY, & FRIED, JJ.

*Attorney at Law*, Disciplinary proceeding, Disbarment.

The appropriate sanction in a bar discipline case for an attorney's conduct as a
member of the bar, resulting in his pleas of guilty in Federal court to four
felony counts of making false statements to a lender, five felony counts of
mail fraud, and two felony counts of wire fraud, is disbarment. [158-160]

INFORMATION filed in the Supreme Judicial Court for the county
of Suffolk on February 21, 1996.

The case was heard by *Marshall, J.*

*Tracy A. Miner* for the respondent.

*Nancy E. Kaufman*, Assistant Bar Counsel.

WILKINS, C.J. The single issue in this appeal is whether the
respondent, George W. Kennedy, should be disbarred or given
the lesser sanction of indefinite suspension. By a four-to-three
vote, with the minority favoring disbarment, the Board of Bar
Overseers (board) voted to recommend Kennedy's indefinite
suspension.[1] A single justice of this court agreed (but acknowl-
edged that the question was a close one). She ordered Kennedy's
indefinite suspension. We give the matter de novo review (cf.
*Matter of Alter*, 389 Mass. 153, 156 [1983]), and conclude that
the appropriate sanction is disbarment.

On January 16, 1996, Kennedy pleaded guilty in the United
States District Court for the District of Massachusetts to eleven
felony counts: four counts of making false statements to a
lender, five counts of mail fraud, and two counts of wire fraud.
On May 10, 1996, a judge sentenced Kennedy to twenty-four
months' probation, nine months of which were to be served in

---

[1]Three board members served on a hearing panel and recommended an
indefinite suspension. Because of recusals and the absence of a member,
several board members did not participate in the board's discussion and vote.

home detention, imposed a $4,000 fine, and ordered Kennedy to perform 200 hours of community service.

Three of the counts to which Kennedy pleaded guilty concerned his making false statements to a federally insured bank while acting as counsel to buyers or sellers of real estate. In each of these transactions, in connection with obtaining a mortgage, Kennedy signed a Federal Housing and Urban Development (HUD-1) settlement statement and a Federal National Mortgage Association (Fannie Mae) affidavit that knowingly and falsely represented the purchase price and the down payment or deposit. In all three cases, the lender was Dime Savings Bank of New York (Dime). After the completion of one of these transactions, Kennedy and two other men involved went to a bar where they laughed and joked that "it was amazing that they could get all this money from Dime." In another of these transactions, two of Kennedy's clients had purchased property in Harwich in 1986 for $70,000. Approximately one year later, the wife of one of the clients applied to Dime for a mortgage on the property of $188,000, stating that she was purchasing the property for $235,000. In December, 1987, Kennedy, as attorney for the sellers, knowingly represented falsely in an affidavit and in a settlement statement that the purchase price was $235,000 and that the deposit was $80,000. The Federal judge who sentenced Kennedy determined that Dime sustained losses of approximately $226,000 in these transactions.

The fourth count involving false statements concerned similar misrepresentations in connection with a transaction in which Kennedy purchased property for himself. In a HUD-1 settlement statement and a Fannie Mae affidavit, Kennedy falsely reported that a down payment of $39,000 was paid. There had been no down payment at all. Dime sustained no losses in this transaction.

The mail fraud and wire fraud counts concerned Kennedy's knowing submission to a mortgage company, not Dime, of fabricated income tax returns containing intentionally inflated misrepresentations of his income. In seeking to refinance some property that he owned, Kennedy intentionally submitted falsified 1990 and 1991 income tax returns to the prospective lender. For example, he submitted a 1991 income tax return stating that his income was $90,410, when his actual 1991 income was $45,930. Kennedy conceded that he had intentionally provided

false income tax figures in this attempted transaction which was never completed.[2]

"We start with the premise that disbarment or indefinite suspension is the usual sanction imposed for a felony conviction." *Matter of Concemi*, 422 Mass. 326, 329 (1996). In the *Concemi* case, we concluded that the lawyer had "shown no special mitigating circumstance that would justify deviation from the usual and presumptive sanction of disbarment following conviction of a serious crime." *Id.* at 330. *Matter of Labovitz*, 425 Mass. 1008, 1009 (1997). See *Matter of Knox*, 412 Mass. 569, 570-571 (1992) (more than two-thirds of all felony convictions have resulted in disbarment or resignation in lieu of disbarment). We have rejected a lawyer's reputation in the community as a special mitigating factor. See *Matter of Concemi*, *supra* at 330; *Matter of Saab*, 406 Mass. 315, 327 (1989). We have also determined that remorse and cooperation with the Federal government are not sufficient justification for the imposition of a sanction less than disbarment where a lawyer is guilty of making a false statement to a federally insured institution. *Matter of Ogan*, 424 Mass. 1015, 1015-1016 (1997).

The appropriate discipline depends on the facts of each case, but we are guided by the sanctions imposed in similar situations. See *Matter of Concemi*, *supra* at 329; *Matter of Hurley*, 418 Mass. 649, 655 (1994), cert. denied, 514 U.S. 1036 (1995). In selecting a sanction, we should consider its effect on, and the perception by, the public and its deterrent effect on other lawyers contemplating similar conduct. See *Matter of Concemi*, *supra* at 329; *Matter of Alter*, 389 Mass. 153, 156 (1983).

In the *Concemi* case, we concluded that disbarment was "the appropriate sanction for an attorney convicted of thirty-five felony counts for conspiracy to defraud a bank, bank fraud, and making false statements to a federally insured bank while acting in his capacity as a member of the bar." *Matter of Concemi*, *supra* at 331-332. In *Matter of Ogan*, *supra*, the lawyer participated in thirty-three sales in which inflated sales prices were reported to lenders to obtain loans that were excessive in relation to (but less than) the true sales prices. *Id.* at 1015. The lawyer feared that he might lose his client's business if he did

---

[2]The board concluded that Kennedy had violated S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (4) and (6), as appearing in 382 Mass. 769 (1981), and Canon 7, DR 7-102 (A) (3), (A) (5), (A) (7), and (B) (1), as appearing in 382 Mass. 785 (1981).

not agree to prepare the false documents. *Id.* at 1016. We ordered this lawyer disbarred as well. *Id.*

In *Matter of Nickerson*, 422 Mass. 333 (1996), on which Kennedy relies, we indefinitely suspended the lawyer from the practice of law. Nickerson was a salaried employee at a law firm. She was not involved in shaping policy at the firm and did not directly profit from her wrongdoing. *Id.* at 337. She was not convicted of bank fraud but pleaded guilty to fourteen counts of making false statements. *Id.* at 336. She cooperated in the prosecution of others and accepted responsibility for her wrongdoing. *Id.*

Kennedy's conduct was more seriously improper than the conduct of Nickerson. The typical Dime false statements cases involve deposits and forbidden second mortgages, but, unlike here, those cases did not involve inflated purchase prices and bank loans exceeding the value of the mortgaged property. Moreover, the preparation of false income tax returns and their submission to a prospective lender is a particularly egregious act and is not found in the *Nickerson* case, or even in the *Concemi* or *Ogan* cases. This deliberate misrepresentation in order to gain financial advantage is most troubling conduct by a lawyer.

We see no special circumstances justifying departure from the presumptive sanction of disbarment. The fact that real estate transactions were not a major part of Kennedy's practice is not a mitigating factor or an excuse. The wrongdoing here did not involve complicated conveyancing procedures. Kennedy knew that he was engaged in improper conduct. Community service, pro bono representation of clients, and a favorable reputation in the community are commendable, but they cannot alone offset the consequences of serious unethical conduct which otherwise calls for disbarment. Although Kennedy apparently received only $110 in legal fees for his services to clients in the transactions involved here, he benefited by retaining his clients. Furthermore, Dime sustained substantial losses.

Kennedy was the decision maker. No employer dictated his conduct. Moreover, he purchased property for himself, obtaining a mortgage equal to the purchase price, by lying to the lender. It is true that Concemi and Ogan engaged in certain egregious conduct that did not occur in the present case. Kennedy, however, committed other, unique improprieties.

The judgment of indefinite suspension is vacated, and a judg-

ment of disbarment shall be entered retroactive to February 26, 1996, the date of Kennedy's temporary suspension from the practice of law.

*So ordered.*